# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2022AP382-CR

†Petition for Review filed

Complete Title of Case:

### STATE OF WISCONSIN,

#### PLAINTIFF-RESPONDENT,

### V.

### CONRAD M. MADER,

#### DEFENDANT-APPELLANT.†

| | |
|---|---|
| Opinion Filed: | June 7, 2023 |
| Submitted on Briefs: | March 17, 2023 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Gundrum, P.J., Neubauer and Lazar, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:          On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jerome F. Buting* of *Buting, Williams & Stilling, S.C.*, Brookfield.

Respondent
ATTORNEYS:          On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sarah L. Burgundy*, assistant attorney general, and *Joshua L. Kaul*, attorney general.

## COURT OF APPEALS
### DECISION
### DATED AND FILED

### June 7, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP382-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF13

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

CONRAD M. MADER,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Calumet County: JEFFREY S. FROEHLICH, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Lazar, JJ.

¶1     NEUBAUER, J.   A jury found Conrad M. Mader guilty of repeated sexual assault of his stepdaughter, Beverly,[1] in violation of WIS. STAT. § 948.025(1)(e) (2021-22).[2]   Mader appeals from the judgment of conviction and from an order denying his postconviction motion, arguing that his trial counsel was ineffective in multiple respects.   Applying the standards for ineffective assistance claims set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), the trial court concluded that Mader's trial counsel performed deficiently in two respects but that those deficiencies did not prejudice Mader.

¶2     We agree with all but one of the trial court's conclusions.   We part company with the trial court concerning testimony from two witnesses—the police investigator who interviewed Beverly and a retired therapist called by the State as an expert—regarding the rarity of false accusations of sexual assault.   We disagree with the trial court's determination that this testimony was admissible.   The testimony improperly vouched for Beverly's credibility and Mader's trial counsel's failure to object to it was deficient performance.   However, we conclude that Mader has not established that this error, and the two other instances of deficient performance identified by the trial court, prejudiced him.   Thus, we affirm the judgment and the order denying postconviction relief.

---

[1] We refer to the victim in this case by a pseudonym consistent with the policy set forth in WIS. STAT. RULE 809.86(1).

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## BACKGROUND

¶3 The State charged Mader in February 2018 after Beverly told police that he had sexually assaulted her on numerous occasions between November 2009 and November 2013, when she was between thirteen and seventeen years old. Attorney Kevin D. Musolf entered an appearance as counsel for Mader shortly after his arrest and represented Mader at trial.

### I. The Trial

¶4 In his opening statement, Musolf emphasized to the jury that witness credibility would be a key issue. He described the case as "a credibility of witnesses case," previewed testimony that would purportedly cast doubt on Beverly's testimony, and told the jury that "what it all comes down to at the end of the day, it's all an issue of credibility. It's all an issue of what makes sense. It's all an issue of what is conflicting and which of the versions you're going to believe."

### A. Susan Lockwood and Gary Steier

¶5 The State's first witness was Susan Lockwood, a retired therapist who spent more than thirty years treating victims of sexual abuse. Lockwood testified that she had provided therapy to more than five hundred persons in her career, though not to Beverly. Lockwood testified about "grooming" behaviors that abusers engage in to facilitate and conceal abuse. She also explained why victims of sexual assault, especially teenagers, do not report assaults immediately. On this point, she explained that teenagers "worry about being believed" more than adults or children because

> we tend to think about teenagers lying about … things that
> they want to be able to do because they want to be able to do
> them because they're starting to have more independence

and get more privileges and start to try to figure out who they are and be a grown-up, and so they do as a group lie more than a lot of adults or children do, but not about sexual assault. I mean, that's a completely different subject.

¶6    Lockwood also testified about the truthfulness of accusers. She agreed that, over the course of her career, she had "becom[e] a pretty good gauge of who they are and their trustworthiness." Lockwood testified that as an advocate she had one client who falsely reported sexual abuse and "three clients who [she] was sure were false reporting" in her career as a therapist. The State emphasized the rarity of false reporting in a follow-up colloquy with her:

Q    I want to make sure that I understand the numbers that you're saying to me. In treating over 500 victims for over thirty-one years, you have four people that you can say is a false report?

A    Yes.

Q    That's it?

A    Yes.

Lockwood went on to describe false reporting as "very uncommon," citing her own experience and research in the field indicating "usually 3 percent to 8 percent of reported sexual assaults are false."

¶7    The State elicited additional testimony regarding the truthfulness of sexual assault allegations from Gary J. Steier, an investigator with the Calumet County Sheriff's Department who interviewed Beverly multiple times. At the end of his direct examination, in response to a question that referenced the research cited by Lockwood, Steier stated that "[o]ut of about 150" reports he had investigated, only one "was a false report."

### B.     Beverly's Testimony

¶8     Beverly described a history of sexual contact with Mader that began shortly after he moved in with Beverly, her mother, and her brother in 2006. She recalled that Mader began giving her back massages when she was in sixth grade, which gradually progressed into full body massages "when Mom wasn't home." Over time, the full body massages, in which Beverly was naked, began occurring in her brother's bedroom in the basement of the home, which had a door that locked. Beverly recalled hearing Mader's "knees cracking" as he "put his body into massaging me, and he would move his hands down to my butt, and he would go down my legs and into my groin area, and he would just get closer and closer, and this happened over a really long period of time."

¶9     Beverly testified that Mader also began fondling her under a blanket when they would watch television, eventually "put[ting] his finger inside my vagina, and he started fingering me." She testified that this contact eventually led to sexual intercourse, which occurred throughout the home and outside of it. Beverly confirmed that she "lost [her] virginity" to Mader and testified that by the time she was thirteen, "[a]bsolutely anything and everything was happening":

> Q     What do you specifically mean?
>
> A     What I mean by that is he already tried anal with me. We were already having full on intercourse. He was going down on me, licking me, touching my breasts, making out with me.
>
> Q     You said licking you. Is that performing oral sex on you?
>
> A     Yes.

5

¶10    Beverly identified a birthmark on Mader's penis that was visible only when it was erect. She also described numerous sexual assaults that occurred during her preteen and teenage years, including the following specific incidents:

(1) On December 23, 2009, the day Beverly's first half sister was born, Mader took Beverly and her brother home from the hospital in the evening, locked Beverly in the bedroom he shared with her mother, and had sexual intercourse with her.

(2) In the summer of 2010, while playing a game in a cornfield, Mader "bent me over so that my hands touched the ground, and he put his penis inside me, and he had sex with me, and … when he was done, he had me go out of the cornfield, and he would run around the complete opposite way so it looks like we weren't even by each other."

(3) On October 1, 2010, when Beverly was in eighth grade and hosting several friends for a sleepover at her house, Mader took her downstairs at night, had sex with her that she described as painful, and then left the basement via a different route than Beverly "in case, you know, Mom was awake or someone was awake to notice that we were together."

(4) In December 2010, a month after Beverly turned fourteen, Mader had sex with her at the family home while her mother was in the hospital, having given birth to a stillborn baby.

(5) In 2011, Mader had sex with Beverly using a "homemade strap-on" consisting of a hollow plastic penis into which Mader placed his penis.

6

The "strap-on" protruded from a hole cut out of the front of Mader's underwear. Beverly testified that the sex "hurt extremely bad," left her bleeding, and that despite "fighting back saying no, no … he just kept going and did what was best for him."

(6) In January 2012, Mader again had sex with Beverly at the house while her mother was in the hospital after giving birth to Beverly's second half sister.

(7) Mader had sex with Beverly "[a] few times a month" in a basement bathroom, including on one occasion by lifting her up on the sink, which left her "lower back … pounding against the sink faucet."

(8) One morning, which Beverly described as a "hurry up before I get caught situation," Mader "went underneath my covers at the bottom of my bed" and "was touching my groin and going into my vagina fingering me, and Mom came in the bedroom and seen that he was under there," at which point Mader claimed he was merely waking Beverly up.

¶11   Beverly confirmed that she was on birth control when the State asked her why she did not become pregnant from Mader. She testified that Mader used condoms and took particular interest in making sure she remained on birth control:

Q   I guess if you know, was there anything that was being used by either you or him that would prevent pregnancy?

A   I was on birth control. I was on the shot, and it worked extremely effective. He made sure I had my shot on time always.

Q   Who made sure?

7

A    Conrad made sure that I had my birth control. "Did you go get your shot? Did you go get your shot?" And he made sure that I was always on birth control.

¶12    Finally, Beverly testified that she told her boyfriend about the assaults when they began dating in 2015 because she "was having issues within [herself] with having a relationship with" him. She explained that he "needed to know" he was not the reason for her discomfort and identified several intimate acts that made her uncomfortable, at which point Musolf objected:

Q    Like it wasn't him when you guys would be intimate?

A    Yeah. There's so much problems right now. In the beginning, he would do certain things to me like just touch my breasts, kiss me, if he would just slowly put his hand on my thigh -- having intercourse with him still, nothing is the same. I can't have a real relationship.

MR. MUSOLF:   Your Honor, I'm going to object to the relevancy of this line of answer.

MR. HABERMAN:   Judge, I'm going to move on, so --

THE COURT:   Please do so.

C.    **Corroborating Witnesses**

¶13    The State also called Beverly's mother, boyfriend, and two former friends to corroborate certain incidents and details related to the assaults. Two former friends confirmed that Beverly disclosed a sexual relationship with Mader when they were in seventh or eighth grade. One former friend testified that Beverly told her about being under a blanket with Conrad and about "instances in the cornfield behind their home where sex would happen."

¶14    Beverly's boyfriend testified that she told him about the assaults a couple of months after they started dating in 2015. He stated that she told him "it

started from age[] thirteen all the way to when she turned eighteen" and "started with massages and progressed over time over the years to sexual intercourse." He acknowledged, in response to questions from the State, that he had been "intimate" with Beverly during their relationship but that she "[doesn't] like to be touched at all, like kissed or anything … it seems like the whole process is uncomfortable for her and that she's just doing it for me."

¶15     Beverly's mother confirmed that she found Mader with his hands under the covers of Beverly's bed one morning. She said he explained the situation by saying he "figured if [he] just tickled her feet and did that, then she'd get out of bed like she's supposed to." She also confirmed that Mader had "a red birthmark on the shaft of his penis towards the top" that was visible up close or if his penis was erect. In addition, she testified that Mader did not accompany her to the hospital when the stillbirth occurred and that he did not stay at the hospital overnight on the day Beverly's first half sister was born. She also testified that she found the "strap-on" attached to Mader's underwear between the mattress and box spring of Beverly's bed in February 2011.

¶16     Beverly's mother also testified that she and Mader took a trip to Door County in March 2011, several months after the stillbirth. According to her, the trip "was supposed to be a relaxing, nice weekend where ultimately I thought intimately that would be a time where we could reconnect," but Mader "very adamantly pretty much did nothing. He turned me down…. We never did end up connecting in that manner."

¶17     Beverly's mother also recalled an incident around Easter in 2011 at Mader's parents' house in which her son

9

> made comments about he'd get better sleep or not being able to sleep, and Conrad's parents and the people there kind of made comments back to him, and [he] said, well, I'd be able to sleep, but it sounds like monkeys in the morning. I'm always dreaming about hearing monkeys.

She testified that "Conrad's dad … made a sexual comment in reference to the fact that someone may have been having sex," but Beverly's mother had started attending morning exercise classes and thus "was never there in the morning."

¶18    Finally, Beverly's mother confirmed that Beverly began using birth control when she was a teenager to regulate her "long, painful periods."

### D.    Mader's Evidence

¶19    For his part, Mader denied any sexual contact with Beverly. He testified that Beverly's mother likely "put [her] up to this" and that Beverly, who did not get along with her mother, went along with it "to gain her mother's love." He also testified that he tried his best to be "a father figure, and the biggest problem was [Beverly] liked to make a lot of things up."

¶20    Mader also called several family members and acquaintances who knew him, Beverly, or her mother to dispute certain details of Beverly's account or to testify as to her or her mother's character for untruthfulness. For example, though Beverly testified that Mader woke her up every morning and that they would have sexual encounters on some mornings, a former coworker of Mader testified that when they first began working together around 2009, Mader would usually arrive at the coworker's house at 6:00 a.m. on weekdays and the two would then drive to work together.

### E. Closing Arguments

¶21 The State began its closing argument by highlighting the importance of credibility in the case. It repeated the false report numbers provided by Lockwood and Steier and argued that "the research says that [sexual assault] doesn't get falsely reported." The State also referenced "the numbers that fall into false reporting" in its rebuttal argument. Musolf repeated his characterization of the case as "a credibility case" and described Beverly as a "storyteller" whose testimony was not believable.

### F. Jury Deliberations

¶22 During deliberations, the jury asked for a copy of a written statement Beverly prepared in January 2018 at Steier's request which detailed the sexual assaults. The jury also asked for the audio recording of Steier's interview of Mader conducted shortly after his arrest "or a copy of the transcript." Musolf and the State agreed to redact Beverly's statement and provide it to the jury. Before sending the redacted version to the jury, the trial court confirmed with Mader that he had seen the redactions, discussed them with Musolf, and wanted the statement to be sent to the jury.

¶23 As for Steier's interview of Mader, the trial court sent a note to the jury advising that no written transcript existed and the recording could not go back to the jury room, but the jury could return to the courtroom to hear the recording or portions of it. The State and Musolf agreed with the court's response. The jury did not return to the courtroom to hear any of the interview. Approximately three hours after receiving the court's note, the jury returned a guilty verdict.

## II.     Postconviction Proceedings

¶24     After trial, Mader filed a postconviction motion raising multiple ineffective assistance claims.  On April 30, 2021, the trial court held a *Machner*[3] hearing at which Musolf was questioned extensively about his strategy and decisions in handling Mader's defense.  Musolf explained that because Mader denied that he ever sexually assaulted Beverly, and there were no other witnesses or physical evidence to corroborate the assaults, his strategy at trial was to attack Beverly's credibility and focus on the implausibility of her allegations:

> Q       What was your theory of the case here?  What was your plan at trial?
>
> A       Conrad was very aggressively interrogated and did not confess, did not have -- or continued to deny. The -- a lot of the things that [Beverly] was saying just didn't make sense, you know, that they had sex in the cornfield while playing hide-and-seek, the doorknobs, how he would -- she claimed he would take the doorknobs off when … you look at a doorknob, the screws are on the inside, not the outside.  Just the sheer preposterousness of her allegations, that he took her down in the basement and had sex with her when she had a slumber party. The strategy was this is just outrageous.  It just doesn't make any sense.

¶25     On February 24, 2022, the trial court issued a written decision denying Mader's postconviction motion.   Applying the two-part test for ineffective assistance established in *Strickland*, the court rejected most of Mader's claims of deficient performance but concluded that Musolf had performed deficiently in failing to object to the admission of certain testimony.  The court concluded further that Mader had not shown that Musolf's deficient performance had prejudiced him because he had not shown a reasonable probability that the outcome of the trial

---

[3] *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

would have been different but for Musolf's errors given Beverly's "compelling" "conduct, appearance, and demeanor on the witness stand" and her detailed and "very credible" testimony about the sexual assaults.

¶26 Additional facts relevant to the claims raised by Mader on appeal are provided below.

## DISCUSSION

### I. Standard of Review

¶27 Ineffective assistance claims present mixed questions of law and fact. *State v. Jenkins*, 2014 WI 59, ¶38, 355 Wis. 2d 180, 848 N.W.2d 786. We "uphold the [trial] court's findings of fact, including the circumstances of the case and the counsel's conduct and strategy, unless they are clearly erroneous." *Id.* Whether counsel's performance meets the legal standard for ineffective assistance is "a question of law that [we] decide[] de novo." *State v. Domke*, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364.

### II. Legal Standards Governing Ineffective Assistance Claims

¶28 In Wisconsin, "criminal defendants are guaranteed the right to the effective assistance of counsel through the Sixth and Fourteenth Amendments to the federal constitution and [a]rticle I, [s]ection 7 of the Wisconsin Constitution." *Domke*, 337 Wis. 2d 268, ¶34. At its core, this right "ensure[s] that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689. Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In applying

the standards governing ineffective assistance claims, our "focus … must be on the fundamental fairness" of the trial. *Id.* at 696.

¶29 To prevail on a claim of ineffective assistance, Mader must prove two things: deficient performance and prejudice. *See id.* at 687. In analyzing Mader's arguments, our review of Musolf's performance is "highly deferential." *See id.* at 689; *Harrington v. Richter*, 562 U.S. 86, 105 (2011). We must attempt "to eliminate the distorting effects of hindsight" and evaluate Musolf's performance "from [his] perspective at the time." *See Strickland*, 466 U.S. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Counsel's performance "need not be perfect, indeed not even very good, to be constitutionally adequate." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted).

### III. Deficient Performance

¶30 Deficient performance is that which falls "below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 687-88). Mader must show that Musolf made errors that were so serious that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See State v. Trawitzki*, 2001 WI 77, ¶40, 244 Wis. 2d 523, 628 N.W.2d 801 (citation omitted). "The proper measure of attorney performance [is] reasonableness under prevailing professional norms." *Strickland*,

14

466 U.S. at 688. An attorney "does not perform deficiently in failing to 'object and argue a point of law' that is 'unclear.'" *State v. Morales-Pedrosa*, 2016 WI App 38, ¶16, 369 Wis. 2d 75, 879 N.W.2d 772 (quoting *State v. Thayer*, 2001 WI App 51, ¶14, 241 Wis. 2d 417, 626 N.W.2d 811).

¶31 The trial court concluded that Musolf performed deficiently in two respects: (1) failing to object to Beverly's mother's hearsay statement that her son made a comment about hearing "sounds like monkeys in the morning" and (2) failing to object to references to Beverly's virginity. *See State v. Bell*, 2018 WI 28, ¶63, 380 Wis. 2d 616, 909 N.W.2d 750 ("[E]vidence that a complainant had never had sexual intercourse is inadmissible."). The State does not contest either conclusion on appeal. We treat this as a concession and will assume without further discussion that Musolf was deficient in not objecting to this evidence. We address below the other acts and omissions claimed by Mader to constitute deficient performance.

### A. Failure to Challenge Testimony Regarding Truthfulness of Accusers

¶32 Mader first challenges Musolf's handling of the testimony of Lockwood and Steier regarding the infrequency of false accusations of sexual assault. Mader contends that this testimony constituted improper "vouching" testimony under *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984) and that Musolf was ineffective because he: (1) failed to object to the testimony and (2) did not consult with or present an expert witness to counter it.

¶33 To review, Lockwood agreed with the State's characterization of her as "a pretty good gauge" of the trustworthiness of persons who report sexual assault, having provided therapy to "well over" five hundred victims in her career. She

15

testified that she had experienced only four instances of false reporting in over three decades of working with victims and told the jury about "research on false reporting" indicating that only three to eight percent of reports are false. Steier, who interviewed Beverly multiple times, testified that he had seen only one false report out of approximately 150 sexual assaults he had investigated.

¶34    In his postconviction motion, Mader challenged this testimony on multiple grounds, including that it did not meet the standards for admission as expert testimony under WIS. STAT. § 907.02 and that it violated *Haseltine*'s prohibition on vouching. At the *Machner* hearing, Musolf testified that he was familiar with *Haseltine* and admitted that he expected Lockwood to testify about percentages of false reports based on a prior case in which she testified. He denied any tactical or strategic reason for not objecting to her testimony or to Steier's testimony about only having experienced one instance of false reporting. The trial court rejected Mader's challenge to Steier's testimony by concluding that he had not testified as an expert, but had merely presented "factual testimony" about his experience with false accusations. With respect to Lockwood, the court ruled that Musolf's failure to object was not deficient performance "given the unsettled status of the law surrounding general statistical testimony and Attorney Musolf's previous experience before this [c]ourt where the questioning was allowed."

¶35    To evaluate Mader's claim, we must determine whether the law was clear that the testimony of Lockwood and Steier was inadmissible. *See State v. McMahon*, 186 Wis. 2d 68, 85, 519 N.W.2d 621 (Ct. App. 1994). Wisconsin law prohibits both lay and expert witnesses from vouching for another witness by testifying that the other witness is telling the truth. *Haseltine*, 120 Wis. 2d at 96; *State v. Jensen*, 147 Wis. 2d 240, 256-57, 432 N.W.2d 913 (1988) (stating that "the expert witness must not be allowed to convey to the jury his or her own beliefs as

16

to the veracity of the complainant with respect to the assault"). "The essence of the rule prohibiting vouching testimony is that such testimony invades the province of the fact-finder as the sole determiner of credibility." *State v. Kleser*, 2010 WI 88, ¶104, 328 Wis. 2d 42, 786 N.W.2d 144. Improper vouching is not limited to express statements from one witness that he or she believes another witness or that the other witness is telling the truth. *Id.*, ¶102. It also occurs where a witness's testimony implicitly suggests that the witness believes another witness's testimony is truthful. *Id.*, ¶¶104-05; *Haseltine*, 120 Wis. 2d at 96 (holding that psychiatrist effectively told the jury that sexual assault victim was telling the truth by opining "that there 'was no doubt whatsoever' that [she] was an incest victim").

¶36 *State v. Morales-Pedrosa* is the most recent published Wisconsin case on this issue. Morales-Pedrosa was convicted of repeatedly sexually assaulting his teenage daughter. *Morales-Pedrosa*, 369 Wis. 2d 75, ¶¶2, 13. On appeal, he argued that his trial counsel was ineffective for not objecting when the State's expert witness, a forensic interviewer, agreed that it was "commonly understood that approximately 90 percent of reported cases are true." *Id.*, ¶19. We rejected this argument after concluding that Wisconsin law was not clear that "general statistical testimony alone might constitute impermissible vouching." *Id.*, ¶26.

¶37 In reaching this conclusion, we explained that *Haseltine* and *Kleser* were distinguishable on their facts and thus did not support a conclusion that the interviewer's testimony was clearly inadmissible. *Morales-Pedrosa*, 369 Wis. 2d 75, ¶23. In discussing the differences between the facts of those cases and the facts in *Morales-Pedrosa*, we identified two of particular significance to the vouching analysis. First, unlike in *Kleser*, it was undisputed that the forensic interviewer had never "met, much less interviewed or examined," the victim in *Morales-Pedrosa*. *Morales-Pedrosa*, 369 Wis. 2d 75, ¶23. The absence of any such personal

17

interaction, we wrote, eliminated any "risk the jury believed [the interviewer] was providing a personal or particularized opinion as to [the victim]'s credibility." *Id.* Second, we highlighted the degree of certitude in the statistical testimony, observing that ninety percent "did not constitute a statistical 'opinion' that was functionally equivalent to [the interviewer] testifying [that the victim] was being truthful with her accusations." *Id.* We were careful to note that "general testimony that '90 percent' of children claiming to have been abused are telling the truth would have less impact on a fact finder *and be less obviously objectionable than testimony that '99.5%,' '98%,' or even '92-98%' are telling the truth*." *Id.*, ¶25 (emphasis added). We left "for another day" the question "what type of statistical testimony might effectively constitute improper vouching." *Id.*

¶38 That day has arrived. The testimony of Lockwood and Steier bears both of the hallmarks we flagged in ***Morales-Pedrosa*** as likely to turn statistical testimony about the prevalence of false reports of sexual assault into improper vouching. First, although Lockwood had not met or counseled Beverly before trial, Steier testified that he interviewed Beverly multiple times during the course of his investigation. He first spoke with Beverly, her mother, and her boyfriend in January 2018, when Beverly disclosed the assaults, and conducted multiple follow-up interviews to obtain further details about the assaults. Indeed, Steier acknowledged that multiple interviews are often required when victims disclose sexual assault because they are often unable to provide a complete, chronological recounting of what took place in a single sitting. Steier testified that he had "conversations back and forth" with Beverly as she prepared her written statement and worked with her to gather photographs and other materials to link specific assaults with particular days or months. Steier's detailed account of his interactions with Beverly connected his final answer on direct examination—that only one of the 150 sexual assaults he

had investigated involved a false report—to Beverly's credibility because it would be clear to a jury that he did not count hers as a false report. His testimony would inevitably be seen by the jury as "a personal or particularized" endorsement of Beverly's credibility. *See Morales-Pedrosa*, 369 Wis. 2d 75, ¶23.

¶39 The extreme rarity of false reports to which Lockwood and Steier attested also weighs in favor of finding a *Haseltine* violation. Lockwood testified that she had experienced only four cases of false reporting in the course of treating more than five hundred victims in her career. Even under a conservative calculation that uses five hundred as the denominator, Lockwood essentially told the jury that 99.2% of the victims she had worked with had truthfully reported. Steier reported personal experience of a similar percentage—one false report in 150 investigations, or 99.33% truthful reports. We agree with Mader that these percentages "provided a mathematical statement approaching certainty" that false reporting simply does not occur. Even the research cited by Lockwood indicating that only three to eight percent of assault reports turned out to be false fits within the range we described in *Morales-Pedrosa* as more clearly objectionable. *See Morales-Pedrosa*, 369 Wis. 2d 75, ¶25.

¶40 Based upon the foregoing, we conclude that the testimony of Steier and Lockwood concerning the frequency of false reporting crossed the boundaries identified in *Morales-Pedrosa* and impermissibly vouched for Beverly's credibility. Musolf acknowledged that he anticipated that Lockwood would testify about the research findings and was familiar with *Haseltine*. *Morales-Pedrosa* applied *Haseltine* to the same type of testimony Musolf expected Lockwood to give. Though we stated in *Morales-Pedrosa* that Wisconsin law "remain[ed] unclear … on the question of whether general statistical testimony alone might constitute impermissible vouching," we identified the additional circumstances that would

render such testimony inadmissible. ***Morales-Pedrosa***, 369 Wis. 2d 75, ¶26. Lockwood and Steier testified to a greater than 99% truthful reporting rate and Steier also recounted his extensive personal interactions with Beverly. A reasonably competent lawyer in Musolf's shoes should have known enough to object to this testimony. His failure to do so was deficient performance.[4]

¶41 Mader also contends that Musolf was deficient because he did not consult or call an expert to rebut Lockwood's testimony. The trial court rejected this argument, concluding that "Musolf made a strategic decision to cross-examine … Lockwood rather than obtain his own expert."

¶42 "Simply calling a lawyer's decision 'trial strategy' is not sufficient to defeat a claim of ineffective assistance." ***State v. Coleman***, 2015 WI App 38, ¶20, 362 Wis. 2d 447, 865 N.W.2d 190 (citation omitted). Musolf had a "duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." ***State v. Carter***, 2010 WI 40, ¶23, 324 Wis. 2d 640, 782 N.W.2d 695 (quoting ***Strickland***, 466 U.S. at 691). Strategic decisions are entitled to significant deference provided they result from the exercise of reasoned judgment. *See* ***State v. Felton***, 110 Wis. 2d 485, 503, 329 N.W.2d 161 (1983) ("Trial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have then relied.").

---

[4] Mader cites cases from other jurisdictions in which courts found statistical testimony as to the rarity of false reports of sexual assault similar to that given by Steier and Lockwood to constitute improper vouching. *See, e.g.*, ***State v. Myers***, 382 N.W.2d 91, 92, 98 (Iowa 1986) (holding that testimony of child abuse investigator (who interviewed victim) that only one child had lied to her about sexual abuse in her sixteen-year career and reference to a study finding only one in 2,500 children falsely reported sexual abuse should have been excluded because it "improperly suggest[ed] the complainant was telling the truth and, consequently, the defendant was guilty"). Because our deficient performance analysis turns on the clarity of Wisconsin law on this point, we do not rely on these out-of-state authorities.

¶43     At the *Machner* hearing, Musolf testified that he expected Lockwood to testify about the scarcity of false sexual assault allegations because she had provided similar testimony in a previous case he had tried. He explained that he decided to address that testimony through cross-examination rather than a motion in limine or an opposing expert. To do so, Musolf obtained the transcript of the prior case so that he could prepare to cross-examine her. He acknowledged that his obligation to investigate includes "consulting with experts in certain cases" but said he did not do so in this case because he "was just going to deal with Lockwood on cross-examination." When asked to explain this decision, Musolf stated that he had "dealt with Lockwood before" and "knew what she was going to be testifying about based upon the [prior case], and that's why I figured I could … effectively cross-examine her." Musolf testified further that he believed he could get Lockwood to acknowledge that "her small number of people who false reported isn't consistent with the data that she would testify about, the 3 to 8 percent" and that "people do lie, period."

¶44     Mader also called David Thompson, Ph.D., a forensic psychologist, at the *Machner* hearing to respond to several points made by Lockwood and Steier in their testimony. In response to Lockwood's claim to be "a pretty good gauge" of assessing the truthfulness of victims, Thompson testified about research indicating that "professionals who work with people" and those who work in law enforcement are not better than others at "discerning truthfulness." He denied there was any scientific basis for her assertion that only four of her patients had falsely reported. Thompson also testified about "methodological problems" with the research on false reporting that, in his opinion, make the specific percentages of false reports that Lockwood testified to unreliable. On cross-examination, Thompson disagreed with Lockwood's characterization of false reporting as "very uncommon," but

stated that "it is relatively uncommon." He also described "4 to 5 percent" as "probably closer to a … ballpark figure" of the frequency of false reports.

¶45 We agree with the trial court's finding that Musolf did not consider consulting or calling an expert witness, and instead opted to rebut Lockwood's testimony through cross-examination. Though in retrospect Musolf stated that he would have presented an expert like Thompson, we cannot evaluate his decision with the benefit of hindsight, but instead must examine it "from [his] perspective at the time." *See Strickland*, 466 U.S. at 689. As he prepared for trial, Musolf was already familiar with Lockwood's testimony, having cross-examined her in a prior case. Based on that experience, Musolf believed he could obtain the favorable evidence regarding the discrepancy between her personal experience and the statistical infrequency of false reporting from her on cross-examination. We cannot say that this was a decision reached in the absence of reasoned judgment.[5]

¶46 Mader disagrees and directs us to *Dunn v. Jess*, 981 F.3d 582 (7th Cir. 2020), but that case is materially distinguishable. In *Dunn*, the Court of Appeals for the Seventh Circuit concluded that an attorney had performed deficiently because he decided to not present testimony from a pathologist regarding the cause of the victim's death based on his mistaken understanding that the medical examiner would provide the same testimony. *Id.* at 592. This "mistaken belief infected [the attorney's] trial strategy to such an extent that his approach to investigating and presenting a no-causation defense [could not] be reasonably

---

[5] Even if we were to conclude that Musolf performed deficiently by choosing to rely on cross-examination over calling Thompson or another similar expert to offer testimony, we would be hard pressed to find that choice prejudiced Mader. Thompson's characterization of four to five percent as closer to an accurate approximation of the frequency of false reports would have bolstered Lockwood's testimony because that range fit within the three to eight percent range to which she testified.

viewed as strategic, even with the 'heavy measure of deference' afforded him under ***Strickland***." ***Dunn***, 981 F.3d at 592 (quoting ***Strickland***, 466 U.S. at 691). No similar mistaken belief is present in this case. Musolf's decision not to call an expert and instead to rely on cross-examination was not deficient performance.

### B. Failure to Object to Testimony Regarding Mader's Diminished Interest in Sex

¶47   Mader next argues that Musolf was ineffective because he did not object when the State asked Beverly's mother questions about Mader's diminished interest in sexual intimacy with her. At the ***Machner*** hearing, Musolf agreed that this testimony was damaging and said his failure to object to it "was an oversight." Musolf also acknowledged not bringing to the jury's attention other evidence that tended to negate the inference that Mader's diminished interest in sex with Beverly's mother was because of his ongoing encounters with Beverly. The trial court concluded that Musolf was not deficient in failing to object to Beverly's mother's testimony because it was relevant and not unfairly prejudicial.

¶48   We begin by examining whether the testimony about her trip to Door County with Mader was admissible because Musolf's "performance cannot be considered deficient for failing to object to admissible evidence." *See **State v. Maday***, 2017 WI 28, ¶55, 374 Wis. 2d 164, 892 N.W.2d 611. To be admissible, evidence must be relevant—it must "tend[] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. §§ 904.01, 904.02. Here, we agree with the trial court that Beverly's mother's testimony was relevant. A reasonable explanation for Mader's lack of interest in sexual intimacy with Beverly's mother during the time period in which he was sexually assaulting Beverly was that he was obtaining sexual gratification elsewhere. In this regard, the

23

testimony about the trip to Door County tended to make the factual question at the heart of the trial—whether the assaults occurred—more likely than it would have been without the evidence.

¶49 We further conclude that WIS. STAT. § 904.03 did not require exclusion of the testimony. Section 904.03 enables trial courts to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice" or other countervailing interests. Mader contends that the testimony was unfairly prejudicial because it was not supported "by any data, research or expert opinion … [tying] the lack of marital sexual relations to the alleged assaultive behavior," thus "encourag[ing] the jury to speculate and respond based on sympathy and emotion." But he cites no authority indicating that expert testimony or research was needed to tie the assaults to his lack of interest in sexual intimacy with Beverly's mother. And it is not apparent to us that expert evidence was necessary to establish the linkage. Sexual interest, or lack thereof, is something "within the common knowledge or ordinary experience of an average juror." *See **Weiss v. United Fire & Cas. Co.***, 197 Wis. 2d 365, 382, 541 N.W.2d 753 (1995). The average juror could readily determine, without expert testimony, why Mader might not have been interested in sexual intimacy with Beverly's mother. Nor would the jury be drawing on sympathy, emotion, or any other improper basis in concluding that his lack of interest could be explained by his ongoing sexual activity with Beverly. Because Beverly's mother's testimony was relevant and not unfairly prejudicial, Musolf was not deficient in failing to object to it.

### C. Failure to Object to Testimony Regarding Beverly's Use of Birth Control and Issues with Sexual Intimacy

¶50 Mader next argues that Musolf was deficient in failing to object to testimony concerning Beverly's use of birth control and the impact Mader's assaults

24

had on her ability to be sexually intimate with her boyfriend after the assaults had ended. He contends this testimony was inadmissible under Wisconsin's rape shield statute, WIS. STAT. § 972.11, which bars evidence or reference "concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct" in a prosecution under WIS. STAT. § 948.025. Sec. 972.11(2)(b). "Sexual conduct" is defined as "any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style." Sec. 972.11(2)(a).[6]

¶51    At the *Machner* hearing, Musolf acknowledged familiarity with WIS. STAT. § 972.11 from prior cases. When asked why he did not object to the questions about birth control and Beverly's sexual intimacy issues, Musolf agreed that he "didn't recognize at that point" that the evidence "was [barred by the] Rape Shield [statute and] probably should have been dealt with first by the Court."[7] The trial court concluded that Beverly's use of birth control was not "prior sexual conduct" as defined in § 972.11(2)(a) because it "was conduct occurring during the alleged sexual assaults." The court concluded further that Beverly's subsequent intimacy issues with her boyfriend were not "prior sexual conduct" but did not offer any reasoning for this conclusion.

---

[6] The statute contains three exceptions in which evidence of sexual conduct may be admissible. WIS. STAT. § 972.11(2)(b)1.-3. The State does not argue that any of the exceptions apply in this case.

[7] WISCONSIN STAT. § 971.31(11) provides that in a prosecution under WIS. STAT. § 948.025, the trial court must decide whether evidence is admissible under WIS. STAT. § 972.11(2) before trial and must find the evidence "material to a fact at issue in the case and of sufficient probative value to outweigh its inflammatory and prejudicial nature before it may be introduced at trial."

¶52     At first blush, Beverly's use of birth control appears to fall within the statute's prohibition because "sexual conduct" includes a complaining witness's "use of contraceptives." *See* WIS. STAT. § 972.11(2)(a).  But the State argues that the testimony was admissible because it was "incident to" the "course of conduct" comprising the sexual assaults.  *See **State v. Gulrud***, 140 Wis. 2d 721, 729-30, 412 N.W.2d 139 (Ct. App. 1987) (quoting ***People v. Stull***, 338 N.W.2d 403, 405 (Mich. Ct. App. 1983)).  Mader disagrees, arguing that Beverly's use of birth control was unrelated to the sexual assaults because her mother obtained birth control for Beverly to help regulate her periods.

¶53     We agree with the State that testimony regarding Beverly's use of birth control is not barred by WIS. STAT. § 972.11(2)(b) because it was connected to the course of Mader's assaults.  "[T]he basic purpose of the rape shield statute is to protect sexual assault victims from embarrassing public exploration into their past sexual conduct unless the evidence elicited is relevant to select specified issues." ***State v. Mitchell***, 144 Wis. 2d 596, 618, 424 N.W.2d 698 (1988).  Here, Beverly's use of birth control was not disconnected from the sexual assaults.  It was closely linked to them.  Though Beverly began taking birth control to regulate her periods, and it is unclear whether her use predated sexual intercourse with Mader, she testified that Mader took particular interest in ensuring that she continued to use it by asking if she had gotten her shot and making sure she did so timely during the years in which the assaults occurred.  She testified further that Mader used a different form of birth control—condoms—during some of the assaults.  The evidence of Mader's apparent preoccupation with Beverly's continued use of birth control during the time period he was sexually assaulting her connects her use of birth control to the course of the assaultive conduct.  *See **State v. Stanislawski***, 62 Wis. 2d 730, 749, 216 N.W.2d 8 (1974) (stating that trial court ruling excluding

evidence of complainant's prior sexual conduct "is not to extend to statements made by complainant concerning an argument with her boyfriend on the night of the alleged rape about going on the pill or conduct connected thereto or so related in time as to be properly considered a part of the res gestae"), *overruled on other grounds by State v. Dean*, 103 Wis. 2d 228, 307 N.W.2d 628 (1981).  Because the testimony about birth control was not inadmissible under § 972.11(2)(b), Musolf was not deficient in failing to object to it.

¶54    In regards to Beverly's testimony about her boyfriend touching her breasts and having sexual intercourse with her, we need not decide the admissibility of that specific testimony under WIS. STAT. § 972.11(2)(b) because Musolf objected to it as soon as Beverly finished her answer and the State did not ask further questions on that subject.  Though Musolf did not ask the trial court to strike Beverly's answer or to instruct the jury to disregard it, Mader did not argue that those omissions constituted ineffective assistance in his postconviction motion and does not offer them as a basis for ineffective assistance on appeal.[8]

### D.    Unsuccessful Attempts to Introduce Evidence of Beverly's Employment

¶55    Mader argues that admission of evidence about Beverly's virginity, use of birth control, and postassault discomfort with sexual activity "misleadingly portrayed [her] as sexually inhibited and fearful."  He notes that Musolf tried to

---

[8] Mader also points to Beverly's boyfriend's testimony about her dislike of being touched or kissed and her discomfort with the "whole process," to which Musolf did not object.  The State argues this testimony was admissible because it merely described her lack of desire for sexual conduct, rather than the conduct itself.  While we do not necessarily agree with the State's characterization of the testimony, the lack of an objection was not deficient performance.  Beverly's boyfriend's single vague reference to intimate conduct was largely duplicative of Beverly's more specific and explicit references to intimate acts (to which Musolf did object) and the absence of an objection was not such a departure from "reasonableness under prevailing professional norms" as to constitute deficient performance.  *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

rebut this impression by introducing evidence that Beverly worked for a company called Pure Romance, hosting parties at which she sold sexual aids and "presented information about sexual practices." The trial court excluded this evidence in a pretrial ruling. Musolf raised the issue again after Beverly's direct examination, arguing that her testimony about the assault with the "strap-on," which "she described [as] very painful, very rough, [and] scary looking," raised a "credibility issue" and allowed him to question her about selling similar products as an adult. The court again excluded the evidence, stating that its probative value to assessing Beverly's credibility was outweighed by its "prejudicial effect" and propensity to divert the jury's attention to matters like "why she decided to get into the area of employment that she's in."

¶56 Mader raises two arguments with respect to the trial court's decision. First, he contends the court erroneously exercised its discretion in excluding the evidence. We disagree. We are to uphold the court's decision provided it "examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. The court's decision clears this low threshold. The court identified the facts relevant to Musolf's request—Beverly's testimony about the "strap-on," Lockwood's testimony that victims of sexual assault react differently to it and can either be "drawn to something that was involved in the event or they avoid it," and the ways in which the jury's attention might be sidetracked by the evidence. The court cited and applied the correct legal standards under WIS. STAT. § 904.03, analyzing the probative value of the evidence and weighing that against its prejudicial effect and potential to confuse the jury. And the court's balancing of these interests was reasonable. Because of the evidence that people react differently to traumatic events, the court could

28

reasonably conclude that Beverly's employment would not "provide anything of substance for the jury to consider" while also posing a greater risk of confusing or misleading the jury by diverting its attention to her choice of employment.

¶57 Mader's second argument is that Musolf did not present the strongest argument to admit the evidence because Musolf did not investigate Beverly's social media presence and thus did not uncover and present several "rave reviews" that party attendees posted on Beverly's Facebook page portraying her as a "knowledgeable" and "fun" hostess. Though Musolf investigated Pure Romance's website, he did not recall investigating Beverly's social media presence despite acknowledging that review of a witness's social media is "in this day and age … part of a usual investigation." Mader argues that the Facebook comments would have strengthened the case for relevance of her work at Pure Romance because they showed that Beverly was not a "reserved, sexually inhibited young woman traumatized by years of sexual abuse" as portrayed in her direct testimony.

¶58 Trial counsel has a duty to conduct a reasonable investigation into the facts "or make a reasonable strategic decision that makes any further investigation unnecessary." *State v. Pico*, 2018 WI 66, ¶22, 382 Wis. 2d 273, 914 N.W.2d 95 (citation omitted). We must assess Musolf's failure to look at Beverly's Facebook page "in the context of the circumstances as they existed at the time he made his decision[]." *See id.* Mader's argument, however, depends significantly on the benefit of hindsight. Musolf knew before trial that Beverly worked for Pure Romance from her written statement. He viewed the Pure Romance website and learned about the company's business. But whether to go further and gather (and present) evidence that Beverly hosted Pure Romance parties at which she promoted and sold sex toys and other intimate products was not a question with an obvious answer. While it can be argued in hindsight that this evidence could have punctured

the image of Beverly as reserved and sexually inhibited, this information may have had the effect of *corroborating* her account given that victims can react to sexual abuse in different ways. Because presenting evidence of Beverly's employment was not without risk before trial, we cannot conclude that Musolf's decision not to examine her Facebook page fell outside "the wide range of reasonable professional assistance" and "amounted to incompetence under 'prevailing professional norms.'" ***Strickland***, 466 U.S. at 689 (first quotation); ***Harrington***, 562 U.S. at 105 (second quotation) (citation omitted).

### E. Failure to Object to Reference to Prospective Juror Statements Regarding Sexual Assault

¶59 Mader next argues that Musolf was ineffective for not objecting to comments made by the State in its closing argument concerning disclosures made by several prospective jurors during voir dire. In response to a question from the trial court, multiple prospective jurors acknowledged that they or a family member or close friend had been the victim of sexual assault, and some stated further that these incidents had not been reported to law enforcement. The State harkened back to these disclosures in its closing argument:

> Remember jury selection process? Remember how many people put their hands up? Holy cow. It's a lot more popular than we would like to know. It's a lot more prevalent.
>
> And remember in the jury selection process, one of those jurors had never reported it to the police. You saw in your own small demographic area the amount of sexual assaults that happened just by being called into jury duty.

Mader argues that the State improperly suggested that the "prevalence" of sexual assault in the community, as reflected in the juror responses during voir dire, was a reason to find Beverly credible.

¶60     At the *Machner* hearing, Musolf acknowledged that he could have objected to the prosecutor's comments and did not have any reason for not doing so. The trial court concluded that the lack of an objection was not deficient performance because the State's remarks "did not affect the fairness of the trial." As support for its conclusion, the court cited several instructions given to the jury directing its members "to use and rely upon their experiences in weighing testimony and reaching a verdict" and not to consider closing arguments to be evidence.

¶61     Mader challenges the trial court's reasoning, noting that some of the prospective jurors who disclosed a prior sexual assault were not selected to serve on the jury. He analogizes this case to *State v. Smith*, 2003 WI App 234, ¶¶25-26, 268 Wis. 2d 138, 671 N.W.2d 854, in which this court concluded that Smith had been prejudiced by his trial counsel's failure to object when a prosecutor suggested that jurors should believe the testimony of police officers because the prosecutor knew them and said they "work[ed] hard" and "d[id] a tough job." In response, the State notes that even if the prospective jurors who reported assaults were not selected for the jury, their comments were heard by those who were selected, and thus became part of the jurors' "common experience" which they could use in evaluating the evidence.

¶62     Attorneys are accorded "considerable latitude in closing arguments." *State v. Burns*, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166. A "prosecutor may 'comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him and should convince the jurors.'" *State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979) (quoting *Embry v. State*, 46 Wis. 2d 151, 160, 174 N.W.2d 521 (1970)). However, a prosecutor crosses "[t]he line between permissible and impermissible argument" when "suggest[ing]

that the jury should arrive at a verdict by considering factors other than the evidence." *State v. Neuser*, 191 Wis. 2d 131, 136, 528 N.W.2d 49 (Ct. App. 1995).

¶63     The State's comments did not amount to a request that the jury find Mader guilty based on matters not in evidence. Instead, the State simply asked the jurors, in evaluating Beverly's credibility, to consider their experience and knowledge of sexual assault and delayed reporting. We have previously declined to consider similar references to matters within jurors' experience improper. *See State v. Nielsen*, 2001 WI App 192, ¶¶47, 50, 247 Wis. 2d 466, 634 N.W.2d 325 (holding that prosecutor's reference to reactions of "[c]itizens out on the street … when questioned as to why didn't you report [an assault] right away" in closing argument was not improper because it merely "appealed to the jurors to use their common experience and general knowledge of the average person's reaction to frightening events").

¶64     Moreover, the State's comments were sandwiched between references to evidence that tended to support Beverly's credibility, such as Lockwood's testimony about the hundreds of assault victims with whom she had worked and the reasons why victims do not immediately report. Viewed in this context, the State's argument marshaled evidence presented at trial with an invitation to the jurors to bring their own knowledge and experience to bear in assessing credibility.

¶65     Mader's reliance on *State v. Smith* is misplaced. In that case, we held that the prosecutor's comments about knowing several police officers who had testified and how dedicated they were to their difficult jobs improperly used "matters not in the record [to] vouch[] for the credibility of the police witnesses." *Smith*, 268 Wis. 2d 138, ¶26. Here, in contrast, the State referenced juror experiences disclosed during voir dire. The law presumes that jurors will not leave

32

such experiences at the courthouse door and encourages jurors to use the knowledge they have derived from their life experience when evaluating the evidence and drawing inferences. *See, e.g.*, WIS JI—CRIMINAL 195 ("In weighing the evidence, you may take into account matters of your common knowledge and your observations and experience in the affairs of life."); WIS JI—CRIMINAL 170 (defining circumstantial evidence as "evidence from which a jury may logically find other facts *according to common knowledge and experience*") (emphasis added); WIS JI—CRIMINAL 300 (instructing jurors to use "common sense and experience" to determine witness credibility). Because there was nothing impermissible about the State's argument, Musolf did not perform deficiently when he did not object.

### F.      Handling of Jury Requests for Statements of Beverly and Mader

¶66      Lastly, Mader argues that Musolf was ineffective because he did not object to a redacted version of Beverly's written statement being sent to the jury and did not ensure that the jury returned to the courtroom to hear the audio recording of Investigator Steier's interview of Mader. With one exception, we agree with the trial court that Musolf's approach to the statements was not deficient performance.

¶67      The trial court responded to a request from the jury for Beverly's written statement by providing a version containing redactions agreed upon by the State and Musolf. Before sending the redacted statement to the jury, the court confirmed that Mader had reviewed the redactions, discussed them with Musolf, and agreed with the decision to send the statement to the jury.

¶68      At the *Machner* hearing, Musolf confirmed that he reviewed the statement "line by line" and agreed to all of the redactions, which were intended to weed out irrelevant information. Musolf explained that he agreed to send the

33

redacted version to the jury because he perceived it to be consistent with his argument that Beverly had fabricated her allegations against Mader:

> My thought was part of our defense is that she's a storyteller, and she wrote out a -- I think I even mentioned it in closing, a fifteen-page novel about all this stuff that could have been described in one or two pages. She wrote fifteen. That was my purpose of not objecting to it going back, that she's a storyteller.

The trial court concluded that Musolf's decision "was trial strategy … done at the defendant's request" and thus did not constitute deficient performance.

¶69 To show deficient performance, Mader must "overcome the strong presumption of reasonableness of [his] defense counsel's trial strategy" by establishing that Musolf's decisions were "irrational or based on caprice" rather than judgment. *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93. Mader argues that Musolf performed deficiently because the redacted version: (1) left visible certain inadmissible content, such as references to Beverly's "virginity, birth control and sexual intimacy problems"; (2) concealed Beverly's explanation that she moved out of the house because of conflict with her mother, which was helpful to the defense; and (3) addressed matters not covered during Beverly's testimony, such as her desire to believe that Mader had not (and would not) sexually assault his two daughters. Mader contends that allowing "false and misleading information into the jury room while redacting statements that were consistent with the defense theory" was "not a reasonable strategy."

¶70 With respect to the references in the statement to Beverly's virginity, we agree that Musolf was deficient in failing to insist that they be redacted. As discussed above, evidence that Beverly had not had sexual intercourse before Mader's assaults was inadmissible under WIS. STAT. § 972.11(2)(b) and Musolf

34

conceded that it simply "didn't occur to [him]" to redact it. *See **Bell***, 380 Wis. 2d 616, ¶63. Thus, the decision not to redact these references was based on caprice rather than judgment.

¶71 Mader's argument concerning references to birth control and Beverly's subsequent sexual intimacy issues is factually unfounded. We have compared the redacted and unredacted versions of Beverly's statement and find no reference to birth control in either version. In addition, the parties did redact several references to Beverly's lack of sexual activity with boyfriends during the years in which the assaults were occurring. The redacted statement thus did not leave references to sexual intimacy issues visible.

¶72 With respect to the redacted explanation for Beverly's decision to move out of the house her mother and Mader owned, and her wish to believe that Mader would not sexually assault her half sisters, Mader has not overcome the strong presumption of reasonableness that attaches to Musolf's agreement to those redactions. Given the lack of physical evidence to corroborate the assaults, Musolf's strategic decision to challenge Beverly's credibility and portray her as a "storyteller" was reasonable. Musolf testified that he assented to the redacted version of Beverly's statement going to the jury because he believed the statement furthered that strategy. Musolf also agreed that he reviewed the statement "line by line" before agreeing to the redactions. Mader acknowledged on the record that he had reviewed the redactions with Musolf and agreed that the statement should go to the jury. Having consulted with Musolf and having agreed to the redactions, Mader cannot now claim that strategic decision constitutes deficient performance. *See **United States v. Weaver***, 882 F.2d 1128, 1140 (7th Cir. 1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective

assistance of counsel."). And, in any event, Musolf's decision was not based on caprice.

¶73 As to the recording of Mader's interview with police, the trial court informed the jurors that the recording could not go to the jury room but that they could return to the courtroom to listen to it.[9] At the ***Machner*** hearing, Musolf confirmed that he thought "the [court]'s answer was sufficient" and that he expected the jury to "send[] a note saying, okay, we want to listen to it. Let's come into the courtroom and listen to it."

¶74 Mader contends that Musolf was deficient in not taking further "action to ensure the jury's request to hear the recording would be honored," given the decision to send Beverly's redacted statement to the jury and absent "affirmative evidence" that the jury had abandoned its request for Mader's interview. Like Mader's argument concerning Beverly's employment with Pure Romance, this contention impermissibly relies on the benefit of hindsight. *See **Strickland***, 466 U.S. at 689. At the time the jury asked to rehear Mader's police interview, Musolf had no way of knowing *why* it wished to do so. It is only in retrospect, with the jury having returned a guilty verdict, that Mader contends that Musolf was deficient in failing to insist that the jury return to the courtroom to listen to the interview. We cannot evaluate the reasonableness of Musolf's decision through that lens.

---

[9] The trial court's response to the jury was proper under Wisconsin law. *See **State v. Anderson***, 2006 WI 77, ¶30, 291 Wis. 2d 673, 717 N.W.2d 74 (stating that when a court grants request to rehear an audio recording during deliberations, "[t]he jury should return to the courtroom and the recording should be played for the jury in open court"), *overruled on other grounds by **State v. Alexander***, 2013 WI 70, 349 Wis. 2d 327, 833 N.W.2d 126.

¶75 Mader analogizes his case to **State v. Anderson**, 2006 WI 77, 291 Wis. 2d 673, 717 N.W.2d 74, *overruled on other grounds by* **State v. Alexander**, 2013 WI 70, 349 Wis. 2d 327, 833 N.W.2d 126. In **Anderson**, the jury asked to hear testimony of both the defendant and the victim during deliberations. **Anderson**, 291 Wis. 2d 673, ¶13. Without notifying or seeking input from the parties, the trial court responded by telling the jury "that it would be 'cumbersome' to read the entire testimony … and that the jury should be more specific about what it wanted to hear." *Id.* The jury sent another note "stating that it did not understand the defendant's testimony," to which the trial court responded by asking the jurors to identify the portions of his testimony they did not understand so it could be read to them. *Id.*, ¶14. The jury did not respond further and did not hear any of the testimony before reaching a verdict. *Id.*, ¶¶14-15.

¶76 Our supreme court concluded that the trial court had "frustrated" and effectively denied "the jury's request to have the in-court testimony read by failing to follow up on the [trial] court's request to the jury for clarification." *Id.*, ¶90. It stated that "[t]he jury may affirmatively abandon its efforts to have the testimony read back, but no such affirmative abandonment occurred here." *Id.* The court concluded further that the circuit court had erroneously exercised its discretion in not re-reading the testimony, in part because it had already sent a videotaped interview of the victim to the jury room without first seeking to determine which portions the jury wanted to watch. *Id.*, ¶100.

¶77 Though **Anderson** bears some factual similarity to the present case, it is materially distinguishable for at least two reasons. First, **Anderson** did not consider the ineffective assistance issue presented here—whether defense counsel was deficient in failing to follow up on a court note to the jury to ensure it returned to the courtroom to hear a defendant's interview with police. The trial court's

communications with the jury in *Anderson* occurred outside the presence of the parties or their counsel. Thus, the court did not have occasion to consider whether any failure by Anderson's counsel to follow up on the court's final note to the jury fell outside the "wide range of professionally competent assistance." *See Strickland*, 466 U.S. at 690.

¶78 Second, unlike in *Anderson*, the trial court's response to the jury in this case did not effectively block the jury from rehearing Mader's interview. The court informed the jury that it would need to return to the courtroom to hear the interview. Unlike in *Anderson*, the court's response did not require the jury to specify which portions of the interview it wished to hear or provide any other information to the court before returning to the courtroom. Thus, there was no need for the court to follow up and Musolf's failure to insist that it do so did not constitute deficient performance.

## IV. Prejudice

¶79 To recap, we have concluded that Musolf was deficient in failing to object to Lockwood's and Steier's testimony about the truthfulness of accusers, and the State has not contested the trial court's conclusions that Musolf was deficient in failing to object to references to Beverly's virginity and Beverly's mother's testimony that her son made a comment about hearing monkey-like sounds in the house. We now consider whether these deficiencies prejudiced Mader.

¶80 To prove prejudice, Mader must show that Musolf's "errors were so serious as to deprive [Mader] of a fair trial, a trial whose result is reliable." *See Strickland*, 466 U.S. at 687. Mader "must show that there is a reasonable probability that, but for [Musolf]'s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *See id.* at 694. Because Musolf's performance was deficient in multiple respects, we assess prejudice "based on the cumulative effect of [his] deficiencies," *see **Thiel***, 264 Wis. 2d 571, ¶59, and consider the impact of the errors in light of the totality of the evidence presented to the jury. *See **Jenkins***, 355 Wis. 2d 180, ¶50. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." ***Strickland***, 466 U.S. at 696. We must also assume that the jury "reasonably, conscientiously, and impartially appl[ied]" the instructions of law given by the trial court. *Id.* at 695.

¶81 Applying these standards to the evidence presented at trial, we conclude that Mader has not carried his burden to show prejudice because he has not established a reasonable probability that his trial would have ended differently absent Musolf's errors. We begin our analysis with two observations. First, as the parties argued to the jury in closing, witness credibility was of particular importance in this case. No witnesses testified that they observed any of the assaults Beverly described and the State did not introduce any physical evidence to corroborate them. The question of Mader's guilt thus depended to a substantial degree on whether the jury believed Beverly's account of the assaults or Mader's denial.

¶82 Our second observation echoes one made by the trial court in its decision denying Mader's postconviction motion: the evidence presented at trial weighed significantly in the State's favor. Beverly provided detailed accounts of numerous sexual assaults that occurred over a multi-year period. She described an evolving course of increasingly sexual conduct perpetrated by Mader that started with massages and progressed over time to include fondling, digital penetration, oral sex, and ultimately vaginal and anal intercourse. Beverly's recounting of these incidents included dates, locations, significant contemporaneous events (such as the

births of her half sisters), and descriptions of the specific sexual positions or acts she and Mader engaged in. She also recalled other details that lent credibility to her account. For instance, she described Mader's knees cracking as he massaged her. She recalled leaving locations of multiple sexual encounters via a different path from Mader in an effort to conceal their conduct. She described the size and appearance of the "strap-on" attached to a pair of Mader's underwear and the physical discomfort and injuries she experienced when Mader used it during sex. She recounted her lower back pounding against a faucet during one sexual encounter in which Mader sat her on a bathroom sink. She described a reddish birthmark on Mader's penis that could only be seen when his penis was erect. And finally, Beverly acknowledged enjoying these encounters initially and having fun "work[ing] to not get caught."

¶83 In addition to Beverly's testimony, the State called other witnesses to corroborate significant aspects of her story. Three witnesses—two former friends and Beverly's boyfriend—testified that she disclosed a sexual relationship with Mader years before she reported the assaults to the police. Beverly's boyfriend described her account as a progression of increasingly intimate acts, starting with massages and leading ultimately to intercourse. Lockwood explained to the jury why victims, in particular teenagers, often do not report sexual abuse until years after it occurs. Beverly's mother, as well as photographs taken by police, confirmed the existence of the birthmark on Mader's penis. Beverly's mother also testified about catching Mader with his hands underneath the covers of Beverly's bed and finding the "strap-on" underneath Beverly's mattress.

¶84 The evidence presented by Mader was, by comparison, meager. Mader testified in his own defense that Beverly's mother "put [her] up to" concocting the assault allegations and Beverly went along with it in an attempt to

"gain her mother's love." He also called several family members and acquaintances to discredit certain details in Beverly's testimony and her and her mother's character for truthfulness.

¶85 With this overall evidentiary picture in mind, we must assess the cumulative effect of the evidence to which Musolf should have objected: (1) Lockwood's and Steier's testimony regarding the infrequency of false accusations of sexual assault; (2) several references to Beverly's virginity; and (3) Beverly's mother's testimony that her son made a comment about hearing monkey-like noises in the morning.

¶86 We have already explained that the testimony of Lockwood and Steier impermissibly vouched for Beverly's credibility, but we do not ascribe a significant weight to that vouching effect for two reasons. First, Beverly's detailed account of years of sexual abuse, along with the contemporaneous and after-the-fact corroboration discussed above, was inherently credible. The vouching testimony, in our view, did not significantly enhance its credibility to the jury. This was not a case in which the evidence for and against guilt was nearly in equipoise. Nor was it a case in which external endorsements of credibility might carry significant weight, as, for example, where a victim offers a vague or conclusory account of sexual assault or the defendant presents a compelling alibi or other defense. Second, we must presume that the jurors followed the trial court's closing instruction that they—not any particular witness or witnesses—were "the sole judges of the credibility, that is, the believability of the witnesses and of the weight to be given to their testimony." *See Strickland*, 466 U.S. at 695.

¶87 We conclude similarly that the references to Beverly's virginity and the reference to her brother's "monkey noises" comment did not significantly

impact the trial. While we acknowledge that the jury may have remembered Beverly's testimony that she lost her virginity to Mader, the trial did not involve issues for which this testimony may have carried significant weight. Whether Beverly consented to the assaults was not at issue and she testified that "full on intercourse" took place before she turned thirteen. Given her age, it is unlikely that the jury would have considered the fact that Beverly lost her virginity to Mader to be significant. Like our supreme court in *Mitchell*, which involved an eleven-year-old victim, we "are not persuaded that the jury would have given more credence to [Beverly's] testimony merely because she testified that she was a virgin." *Mitchell*, 144 Wis. 2d at 620. As for Beverly's mother's reference to her son making a comment about hearing monkey noises, the remark itself was vague, not repeated by the State in closing, and any suggestion of sexual conduct between Beverly and Mader that it carried was neutralized by Beverly's brother's testimony that he neither saw nor heard firsthand "any sort of sexual relationship between [them]." Considered together, we conclude that the effect of Musolf's errors was not so great that it resulted in a trial whose result is not reliable.

## CONCLUSION

¶88     For the reasons stated above, we conclude that Mader has not proven that he received ineffective assistance at trial. Though Musolf's performance was deficient in several respects, Mader has not shown that those errors prejudiced him. Accordingly, the trial court correctly denied Mader's motion for postconviction relief.

*By the Court.*—Judgment and order affirmed.